902 So.2d 670 (2004)
Dr. Virginia L. HOUSERMAN and Honea & Houserman, P.C.
v.
Jennifer GARRETT.
Jennifer Garrett
v.
Dr. Virginia L. Houserman and Honea & Houserman, P.C.
1030587 and 1030789.
Supreme Court of Alabama.
December 10, 2004.
Richard Franklin and Mary Carol Ladd of Armbrecht Jackson, LLP, Mobile, for appellants/cross-appellees Dr. Virginia L. Houserman and Honea & Houserman, P.C.
Charles R. Crowder and Annesley H. DeGaris of Cory, Watson, Crowder & DeGaris, P.C., Birmingham, for appellee/cross-appellant Jennifer Garrett.
*671 NABERS, Chief Justice.
This medical-malpractice case involves the post-surgical retention within a patient's body of a surgical aid known as a Kerlix brand gauze pad.[1] Jennifer Garrett, on June 30, 1995, underwent surgery to reverse a bilateral tubal ligation that had been performed years earlier. This reversal surgery, known as an isthmic-ampullary renanastomosis, is intended to surgically repair the fallopian tube after it has been cut or burned apart in a tubal ligation. The isthmic-ampullary renanastomosis procedure involves delicate microsurgery, made more difficult because the surgical site is located within the abdomen. Garrett's surgery was conducted by Dr. Virginia Houserman, who was assisted by her partner, Dr. Kathryn Honea.
Dr. Houserman and Dr. Honea practice medicine together as Honea & Houserman, P.C. Dr. Houserman and Dr. Honea are board-certified specialists in obstetrics and gynecology, and in the subspeciality of reproductive endocrinology. The surgery was performed at Brookwood Medical Center, which is operated by Brookwood Health Services, Inc. Assisting in the surgery were three nurses employed by Brookwood Health Services (Diana L. Tunney, Scott Thomas, and Carolyn Newsome). Dr. Houserman does not dispute that the Kerlix pad was placed under Garrett's uterus during surgery to elevate the uterus for better access and that this pad was not removed after the surgery was completed. It is undisputed that Nurse Tunney was responsible for counting the surgical sponges and surgical devices used in this procedure before and after the surgery and that she apparently did not include the Kerlix pad in her pre-surgery count and did not advise Dr. Houserman, before the surgical site was closed, that a pad or surgical device was unaccounted for. The evidence shows that Nurse Tunney may have lacked an understanding of how to record and keep track of the Kerlix pad and that she did not in fact include it in her count, which was verified three times before the surgical site was closed, in compliance with hospital policy. The evidence also shows that Nurse Tunney was not in the operating theater when the Kerlix pad was placed in Garrett's body and that she may not have been informed by the nursing staff that the Kerlix pad had been inserted.
The testimony in the case establishes that Dr. Houserman completed a three-part check before closing the surgical site: a visual inspection, a manual inspection (by feel), and a numerical count conducted by Nurse Tunney, the circulating nurse attending the surgeon. Manual inspection of the surgical site was complicated by the nature of the surgery and by the microscopic size of the fallopian tube. Testimony established that the reversal surgery is so delicate that a bump to the uterus or a shifting of the tissues could potentially undo the surgery, so the manual manipulation of tissues within the surgical cavity was constrained. By the same token, the visual examination of the surgical area was compromised in that the tissues could not be subjected to gross movement, and by the further fact that during the course of the surgery the site became covered with blood, bodily fluids, and other liquids, such *672 as methylene blue dye, introduced into the site to prevent infection and cross-contamination.
It is undisputed that Garrett began experiencing significant discomfort and pain almost immediately after this surgery and that she visited Dr. Houserman several times seeking relief. Due, at least in part, to the fact that the Kerlix pad used by Dr. Houserman had no X-ray signature, none of the examinations conducted by Dr. Houserman subsequent to the surgery disclosed the presence of the pad. It was only when an abscess formed, with accumulated bodily fluids that were visible in tests conducted on Garrett, that it was deemed necessary to conduct additional surgery to evaluate her condition. This second surgery occurred approximately eight months after the initial surgery. During this period an infection had developed in Garrett's abdomen, and this second, exploratory surgery disclosed damage to her intestine that required the removal of a portion of it during the second surgery. The Kerlix pad was also found and removed during this surgery. It is undisputed that after this second surgery Garrett underwent a lengthy period of recovery, that she experienced great discomfort, and that she required medical and nursing care for a period of months. Dr. Houserman performed the second surgery, but she called in a general and colorectal surgeon, Dr. Dan Mirelman, to repair the injury to Garrett's intestine.[2]
Garrett sued Dr. Houserman and Dr. Honea; Honea & Houserman, P.C.; Brookwood Medical Center; the three nurses who assisted in Garrett's surgery; and Assisted Reproductive Technology, a tradename used by Dr. Houserman and Dr. Honea. During this litigation Blue Cross & Blue Shield of Alabama intervened as a plaintiff to assert a claim for medical payments it had made on behalf of Garrett.
Ultimately the claims against Assisted Reproductive Technology were dismissed, and a summary judgment was entered for Dr. Honea. Brookwood Medical Center and the three nurses entered into a pro tanto settlement with Garrett in the amount of $158,000 and were dismissed from the case. Of that pro tanto settlement, $15,000 was paid to Blue Cross & Blue Shield in settlement of their subrogation interests. A jury trial was held in the Jefferson Circuit Court against the remaining defendants, Dr. Houserman and Honea & Houserman, P.C.; the jury returned a verdict for Garrett in the total amount of $358,000. After applying a credit for the amount paid by the dismissed defendants pursuant to the pro tanto settlement, a judgment was entered against Dr. Houserman, and Honea & Houserman, P.C., for $200,000.
The defendants filed a postjudgment motion for a judgment as a matter of law, or, in the alternative, for a new trial, or, in the alternative, for a remittitur of the damages award. The trial court denied the motion.
Dr. Houserman, and Honea & Houserman, P.C., appealed to this Court. Garrett filed a cross-appeal seeking to set aside the credit applied to the judgment for the subrogated amount of $15,000 and to have that sum reinstated as a part of the judgment against Dr. Houserman and Honea & Houserman, P.C. Garrett also sought in *673 her cross-appeal an award of costs, but she has now abandoned that claim.[3] Garrett previously asserted those claims in properly filed postjudgment motions in the trial court, where they were denied.
In excellent briefs, the parties discuss the fact that this Court has recently harmonized and unified our caselaw in medical-malpractice cases involving the retention of surgical devices, citing Breaux v. Thurston, 888 So.2d 1208 (Ala.2003). Prior to Breaux this Court had decided several cases that could be read to hold that in a retention case proof that the physician had placed a foreign object such as a sponge, pad, or surgical device in a patient's body, coupled with proof that the foreign object had then been left in the patient's body, constituted negligence per seremoving the question of negligence from the province of the jury. Powell v. Mullins, 479 So.2d 1119 (Ala.1985); and Ravi v. Williams, 536 So.2d 1374 (Ala.1988) ("Ravi I"). Significantly, other decisions of this Court could be read to hold that the same measure of proof could be taken to constitute prima facie proof of negligence, and consequently the existence of negligence in that instance could be rebutted by adequate proof presented by the physician. Northeast Alabama Reg'l Med. Ctr. v. Robinson, 548 So.2d 439 (Ala.1989); and Ravi v. Coates, 662 So.2d 218 (Ala.1995) ("Ravi II"). Breaux discussed these four cases and found the applicable standard to be as follows:
"The holdings of these cases may be summarized and harmonized as follows: Although it is the responsibility of a surgeon to remove before closing the incision all foreign objects due to be removed, the critical issue to be put to the jury is whether the surgeon conformed to the standard of care in attempting to fulfill that responsibility. The presence of the retained object is prima facie evidence of negligence by the surgeon in carrying out that responsibility. The presence of the retained object does not, however, establish negligence per se. Rather, it serves to shift the burden to the defendant surgeon to show that he or she was not negligent because he or she fully complied with the statutorily defined standard of care. The fact that the operating-room nurses responsible for counting objects before and after the surgery report a final `correct' count does not in itself relieve the surgeon of liability. Rather, for a jury question to be presented, there must be expert testimony establishing the medical standard of care for attempting to prevent the retention of foreign objects in the body after surgery. To the extent that the surgeon relied on the nurses' counts, there must be expert testimony establishing that such a practice is within the standard of care. If, after the plaintiff offers prima facie evidence of negligence by a showing that a foreign object was retained in the body after surgery and the burden shifts to the surgeon, the standard of care is clearly established by expert testimony and there is substantial evidence indicating that the surgeon complied with all components of that standard of care, a jury question is presented as to whether the surgeon was in fact negligent."
Breaux, 888 So.2d at 1217 (some emphasis original; some emphasis added).
Breaux, in its synthesis of our prior decisions, makes it clear in the language emphasized above that in a medical-malpractice case proof of a retained foreign *674 object in the body following surgery amounts only to a prima facie showing of negligence, which can be met by expert and other supporting testimony indicating that the defendant physician has acted within the applicable standard of care.[4] Such a showing by the physician creates a jury question as to whether the physician was in fact negligent.
In this case Dr. Houserman sought to show that the applicable standard of care required her to visually inspect for retained objects, to manually search for retained objects, and to confirm the removal of retained objects from the body by a count of those objects before the surgical site is closed. Dr. Houserman sought to show that she, in fact, complied with that standard of care in performing the surgery on Garrett.
In the uncertain pre-Breaux context in which this case was tried there were continuous disputes between the parties as to whether proof of the applicable standard of care and Dr. Houserman's alleged compliance with that standard would be allowed. Many times the court prevented such proof; on other occasions it allowed the proof, sometimes without objection by Garrett. If this case were to turn on evidentiary rulings alone, we would be required to review the record as a whole to determine if, in light of all the evidence, the trial court in excluding certain evidence exceeded the scope of its discretion. We find it unnecessary to do so because the trial court's charge to the jury presents a dispositive issue.
The trial court conducted an extensive and searching conference on the jury charge in a probing effort to reconcile the pre-Breaux cases. Nevertheless, the charge in this case reflects the same deficiencies as the one given in Breaux.
The charge by no means makes it clear that although proof of a retained object creates a prima facie case of negligence, the burden then shifts to the defendant physician, who, upon presenting substantial evidence of the applicable standard of care and his or her compliance with it, may be found by the jury not to have been negligent. In relevant part the charge states:
"The standard of care to be applied in regard to foreign objects that are left inside a patient after surgery is that the physician who conducted the surgery bears the responsibility for removing all foreign objects from the patient's body and is not that of the nurses. The physician cannot by delegating the task of counting the foreign objects once she has removed them relieve herself from the liability of injury to the patient caused by leaving a foreign object in the body.
"The fact that all physicians engaged in practice in the defendant's same general neighborhood routinely delegate the task of accounting for foreign objects and relying on counts given to them by other nurses or assistants does not relieve the physician of the liability for such foreign objects left inside the patient's body. The nurse's responsibility of counting them afterwards amounts to only an added precaution taken by the defendants to help ensure that they have properly performed their duty.

*675 "If you find, ladies and gentlemen, by substantial evidence that the defendants left a foreign object inside the patient and sewed her up leaving such foreign object inside, that is prima facie evidence that a breach of the standard of care that is required of the physician practicing in the area of surgery. In such case the burden of proof would then shift to the defendants to show to reasonably satisfy you [sic] by substantial evidence that they did not breach the standard of care required of a physician practicing in the area of speciality."
Dr. Houserman and Honea & Houserman, P.C., objected to this instruction, focusing on the refusal of the trial court to include in it the phrase "in and of itself" after the phrase "by other nurses or assistants does not" in the first sentence of the second paragraph quoted above. This objection was based on our pre-Breaux holding in Ravi II, supra. Dr. Houserman and Honea & Houserman, P.C., also requested jury instructions that contained language regarding the right of the defendant physician to rebut evidence of negligence established by the presence of a retained object by showing that she was not negligent because she fully complied with the applicable standard of care. The trial court refused to give the instructions.
The first sentence in the part of the jury charge quoted above defines a standard of care that is contrary to the standard applicable to Dr. Houserman and that she sought to prove she had met. It also implies that the physician is per se liable in the event a foreign object is not removed following a surgical procedure.
The charge goes on to state that "[t]he physician cannot by delegating the task of counting the foreign objects once she has removed them relieve herself from the liability of injury to the patient caused by leaving a foreign object in the body."
The second paragraph of the charge quoted above accentuates the deficiencies of the charge, implying per se liability on the part of the physician for failure to remove a foreign object from a patient's body: "The fact that ... physicians... routinely delegate the task of accounting for foreign objects and relying on counts given to them ... does not relieve the physician of the liability for such foreign objects left inside the patient's body. The nurse's responsibility of counting them afterwards amounts to only an added precaution...."
Even the language of the third paragraph of the charge  that evidence of retention of a foreign object is "prima facie" evidence of negligence and that "[i]n such case the burden of proof would then shift to the defendants to ... reasonably satisfy you by substantial evidence that they did not breach the standard of care ..."  is confusing when read in light of the first sentence of the charge that "[t]he [applicable] standard of care ... is that the physician ... bears the responsibility for removing all foreign objects from the patient's body...." Given the juxtaposition of those two sentences, without clarification elsewhere in the charge, it is hard to determine what, if anything, a physician could do, if a plaintiff has presented proof of a retained object following surgery, to establish that he or she did not breach the standard of care.
The charge given here is similar to the charge found wanting in Breaux. In both the Breaux charge and the one before us the trial court never defined for the jury the concept of "prima facie evidence of negligence" and never discussed with it any way the physician could satisfy the burden "cast" upon her if the jury was satisfied of "the truthfulness" of the plaintiff's claim that the physician, in performing the operation, left a foreign object in *676 the plaintiff's body. Breaux, 888 So.2d at 1222. In both cases the trial judge charged the jury that the nurse's count amounted "only to an added precaution" when, in fact, in light of the evidence, the jury was entitled to find that the nurse's count was valid evidence that the physician had satisfied one component of the standard of care.
The Breaux charge differed from the charge in this case in one material aspect  its statement that "[t]he mere fact that the surgeon delegated the task of counting the instruments and other foreign objects once he had removed them from the patient, does not by itself relieve the surgeon of his responsibility to remove them in the first instance...." Breaux, 888 So.2d at 1219-20 (emphasis added). The inclusion of the phrase "by itself" in Breaux was not deemed sufficient to convey adequately to the jury the ability of the defendant physician, once the plaintiff has made a prima facie showing of negligence, to demonstrate compliance with the standard of care and avoid liability. The exclusion of a comparable phrase in this case, over the defendants' objection, highlights the insufficiency of the charge, when viewed in its entirety.
We note that Garrett attempts to distinguish this case from Breaux by noting, correctly, that in Breaux there was no dispute as to the applicable standard of care, while in this case there was a dispute as to the applicable standard of care. The fact that in this case there was conflicting testimony as to the applicable standard of care certainly does not lessen the importance of a proper instruction on the standard of care and its relation to a finding of negligence.
Our Court has repeatedly held that an incorrect or misleading charge may be the basis for a new trial. Holly v. Huntsville Hosp., 865 So.2d 1177, 1187-88 (Ala.2003). We recognize that in reviewing an allegedly defective jury instruction we are to review the entire charge to determine whether reversible error occurred, and we have done so. Sewell v. Internal Medicine & Endocrine Assocs., P.C., 600 So.2d 242 (Ala.1992). As we have noted, Dr. Houserman and Honea & Houserman, P.C., through objection and requested jury instructions, properly raised this issue below.
We find the jury charge, viewed in its entirety, to be "misleading and erroneous," and we further find that error to have "probably injuriously affected substantial rights of" Dr. Houserman and Honea & Houserman, P.C., and therefore prejudiced them. Rule 45, Ala. R.App. P.; Holly v. Huntsville Hosp., 865 So.2d at 1188.
The judgment is reversed, and this cause is remanded to the trial court for further proceedings consistent with this opinion. The cross-appeal, having been mooted by our holding in the appeal is hereby dismissed.
1030587  REVERSED AND REMANDED.
1030789  APPEAL DISMISSED.
BROWN, HARWOOD, and STUART, JJ., concur.
SEE, J., concurs specially.
SEE, Justice (concurring specially).
I concur in the main opinion, and I write only to reiterate the point I made in my special writing in Breaux v. Thurston, 888 So.2d 1208, 1223 (Ala.2003)(See, J., concurring specially).
A Kerlix brand gauze pad was left inside Jennifer Garrett and was discovered approximately eight months after the surgery, during exploratory surgery to locate the source of the problems Garrett had *677 been having since the initial surgery. In Breaux, I stated that "the plaintiff must present substantial evidence indicating that the surgeon did not fully comply with all aspects of the standard of care." 888 So.2d at 1223. Evidence that a foreign object was left in the patient's body following a surgery establishes a prima facie case of negligence. Thereafter, the burden of going forward shifts to the defendant physician to present evidence of what the physician argues is the applicable standard of care and evidence indicating that the physician complied with all aspects of that standard of care.
If the physician offers such evidence, the ultimate burden is on the plaintiff to prove the standard of care and that the defendant did not fully comply with all aspects of that standard of care. Thus, if Dr. Virginia Houserman and Honea & Houserman, P.C., present evidence as to the standard of care and Dr. Houserman's full compliance with that standard of care, then the burden is on Garrett to present evidence sufficient to overcome Dr. Houserman and Honea & Houserman, P.C.'s evidence.
NOTES
[1] Kerlix is a brand name for a surgical-gauze product available in several forms and sizes, including rolls and pads. The Kerlix pad used in this instance is described in the testimony as being the size of a "fist." Although a Kerlix pad is a not "sponge," it was most often referred to in that way during the trial of this case. The regulations of Brookwood Medical Center, where the surgery underlying this action was performed, generally prohibit the use of Kerlix brand gauze during surgery, without a special feature that makes it detectable by X-ray. The Kerlix pad used here did not have that feature.
[2] Dr. Mirelman testified at trial. He offered testimony on the applicable standard of care and further testimony to the effect that Dr. Houserman's treatment of Garrett during the initial surgery had fallen below the applicable standard of care. Dr. Mirelman's qualifications to testify were challenged on the ground that he is not a "similarly situated health care provider" within the contemplation of § 6-5-548(d), Ala.Code 1975.
[3] Garrett's brief, p. 68, citing City of Birmingham v. City of Fairfield, 396 So.2d 692 (Ala.1981).
[4] Alabama Code 1975, § 6-5-548, as amended in 1996, provides that the initial burden of proof in an action against a health-care provider seeking damages for injury or wrongful death falls on the plaintiff and that the evidentiary burden the plaintiff must meet is "substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice have and exercise in a like case." § 6-5-548(a).